IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| DENNIS MICHAEL MINTUN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CV06-447-S-BLW |
| | ) | |
| vs. | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| LES PETERSON; RANDY BLADES; | ) | |
| S. LONG; PAM SONNEN; R. | ) | |
| JORDAN; D. DIETZ; K. YORDY; | ) | |
| GREG WREN; K. BASSFORD; | ) | |
| ROBERT JORGENSON; TERRY | ) | |
| KNAPP; M. JOHNSON; SGT. HOUSE; | ) | |
| SGT. BILLIE FINLEY; DARRELL | ) | |
| TAYLOR; KATHLEEN McNULTY; | ) | |
| SGT. M. WHITE; SGT. D. WILLIAMS; | ) | |
| C/O BERTWELL; and C/O D. | ) | |
| JOHNSON; | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Pending before the Court are various motions filed by the parties.  Having fully

reviewed the record, the Court finds that the decisional process would not be significantly

aided by oral argument.  Therefore, in the interest of avoiding further delay, the Court

shall decide this matter on the written motions, briefs, and record without oral argument.

D. Idaho L. Civ. R. 7.1(d).  Accordingly, the Court enters the following Order.

**MEMORANDUM DECISION AND ORDER  1**

**DEFENDANTS' MOTIONS FOR EXTENSION OF TIME AND
MOTION TO FILE OVERLENGTH REPLY BRIEF**

Defendants have filed two Motions for Extension of Time to File a Reply Brief
(Docket Nos. 51 & 52).  Plaintiff objects to such an extension (of less than a week).
Plaintiff's objection is not well-founded, as this Court previously granted him a one-
month extension.  *See* Docket Entry No. 34.  The motions for an extension of time will be
granted.  Defendant's Reply in Support of the Motion for Summary Judgment (Docket
No. 55) and Defendants' Motion to Strike (Docket No. 54), lodged concurrently with the
Reply, are considered timely filed.

Defendants have also filed an unopposed Motion for Leave to File an Overlength
Reply Brief (Docket No. 53).  The Court will grant this motion.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**A.     Introduction**

Plaintiff is a homosexual prisoner in the custody of the Idaho Department of
Correction ("IDOC"), currently incarcerated at Idaho State Correctional Institution
("ISCI").  Plaintiff claims he was the victim of multiple civil rights violations by ISCI
employees.  Plaintiff brought this lawsuit under 42 U.S.C. § 1983 against the following
Defendants, who at relevant times were employed at ISCI in the following capacities as
alleged by Plaintiff:

**MEMORANDUM DECISION AND ORDER  2**

1.    Les Peterson, chaplain
2.    Darrell Taylor, chaplain
3.    Karen Bassford, librarian
4.    Greg Wren, supervisor of Karen Bassford
5.    Robert Jorgenson, supervisor of the print/decal shop at Correctional
      Industries
6.    Terry Knapp, supervisor of Robert Jorgenson
7.    Richard Jordan, housing Sergeant in Unit 14
8.    Stan House, facility move coordinator
9.    D. Dietz, Lieutenant
10.   Billie Finley, housing Sergeant in Unit 16
11.   Randy Blades, Warden
12.   S. Long
13.   K. Yordy
14.   Pam Sonnen
15.   M. Johnson
16.   R. LaTulippe
17.   Kathleen McNulty
18.   Sergeant M. White
19.   Sergeant D. Williams
20.   C/O Bertwell
21.   C/O D. Johnson[1]

Plaintiff asserts First Amendment free exercise and retaliation claims, as well as

claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),

against Defendants Peterson, Taylor, and Blades in connection with Plaintiff's

participation in a non-denominational Christian fellowship and choir.  Plaintiff asserts

Fourteenth Amendment claims against Defendants Peterson, Taylor, Bassford, Wren,

Jorgenson, Knapp, and Blades, arguing that these Defendants denied Plaintiff equal

---

[1] Defendants McNulty, White, Williams, Bertwell, and D. Johnson were not named in his complaint, but were instead identified as "Doe" Defendants.  On July 28, 2008, Plaintiff moved to substitute these Defendants.  *See* Docket No. 22.  The Court allowed him to proceed against these Defendants and ordered him to file an amended complaint alleging how these Defendants violated his constitutional rights.  *See* Docket No. 31.  Plaintiff did not do so.  Summary judgment will thus be granted to these Defendants.  *See infra* Part G.

**MEMORANDUM DECISION AND ORDER  3**

protection because he is gay.  He also claims his Fourteenth Amendment rights were

violated by Defendants Long and Blades by finding him guilty without due process on a

Disciplinary Offense Report ("DOR") for allegedly engaging in sexual activity with

another inmate.  Finally, Plaintiff alleges that Defendants Jordan, House, Dietz, Finley,

and Blades violated his Eighth Amendment right against cruel and unusual punishment

when they placed Plaintiff in certain housing units where he was attacked by other

inmates.

Plaintiff filed his initial Complaint (Docket No. 3) on November 7, 2006.  The

Court reviewed the Complaint pursuant to 28 U.S.C. §§1915 and 1915A, and allowed

Plaintiff to proceed on his free exercise, retaliation, equal protection, and Eighth

Amendment claims.  *See* Initial Review Order (Docket No. 6).  Following that review,

Plaintiff filed a First Amended Complaint (Docket No. 7) ("FAC"), which asserted the

same claims as in the initial complaint, added a claim under the Religious Land Use and

Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc ("RLUIPA"), and contained

allegations against more Defendants.[2]  FAC at 2, 5.

---

[2] Defendants did not move for summary judgment on the RLUIPA claim.  They state that
this claim was only mentioned by Plaintiff in his response to the motion for summary judgment,
and that Plaintiff was not authorized to proceed on a claim under RLUIPA.  Defendants' Reply
Memorandum in Support of Motion for Summary Judgment ("Reply") at 10; *see also id.*
("Defendants have not addressed unauthorized issues.").

Plaintiff did not invoke RLUIPA in his initial Complaint, so the Court had no occasion to
review that claim.  Defendants are therefore correct that the Initial Review Order says nothing
about Plaintiff being allowed to proceed on an RLUIPA claim.  However, Plaintiff filed a First
Amended Complaint -- the operative complaint in this case -- that asserted a claim under the
"Religious land use act."  FAC at 5.  The Court does not necessarily review an amended
complaint after it has already allowed a plaintiff to proceed under 28 U.S.C. §§ 1915 and 1915A,

**MEMORANDUM DECISION AND ORDER  4**

In its Order dated February 11, 2008, the Court allowed Plaintiff to proceed on his claims against all Defendants other than Officer LaTulippe, Pam Sonnen, and K. Yordy. *See* Docket No. 11.  The remaining Defendants answered the FAC on May 2, 2008.  *See* Docket No. 20.  Defendants filed the instant motion for summary judgment on March 3, 2009.  *See* Docket No. 28.

## A.     Standard of Law

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not . . . a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

---

and it did not do so in this case.

 The Court is a bit skeptical that an attorney practicing in this area of law would not recognize that an inmate using the phrase "Religious land use act" was intending to invoke RLUIPA.  But Defendants might have mistakenly believed that, because the Court did not issue a second order explicitly allowing the RLUIPA claim, Plaintiff was precluded from pursuing it. The Court will allow Defendants to address this claim in a supplement to their motion for summary judgment, as explained more fully in Part C.2.

**MEMORANDUM DECISION AND ORDER  5**

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those which may affect the outcome of the case.  *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings.  *Id.* at 255.  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor.  *Liberty Lobby*, 477 U.S. at 256-57.  The non-moving party must go beyond the pleadings and show "by [his] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists.  *Celotex,* 477 U.S. at 324 (citation and internal quotation marks omitted).  A verified complaint based on personal knowledge of admissible evidence constitutes an

**MEMORANDUM DECISION AND ORDER  6**

opposing affidavit to a summary judgment motion. *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995); *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979) (where the factual allegations of a verified complaint establish a prima facie case for relief under § 1983, and where the affidavits in support of summary judgment present conflicting versions of the facts which require credibility determinations, a genuine issue as to the material facts of the incident is presented, precluding summary judgment).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of Am.,* 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed. R. Civ. P. 56(e). In determining admissibility for summary judgment purposes, it is the content of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id*. (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Indep. Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995). The Ninth Circuit "ha[s] repeatedly held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment." *Beyene v. Coleman Sec. Services, Inc.,* 854 F.2d 1179, 1182 (9th Cir. 1988) (citation and internal quotation marks omitted). Authentication, required by Federal Rule of Evidence

**MEMORANDUM DECISION AND ORDER  7**

901(a), is not satisfied simply by attaching a document to an affidavit.  *Id.*  The affidavit must contain "testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document."  *Id.*

**B.      Standard for Civil Rights Claims**

To prevail on a claim under 42 U.S.C. § 1983, the civil rights statute, a plaintiff must show that a violation of his rights protected by the Constitution or created by federal statute occurred, and that it was proximately caused by conduct of a person acting under color of state law.  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  In *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), the court outlined the requirements for a finding of proximate causation:

> Liability under section 1983 arises only upon a showing of personal participation by the defendant.  *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979).  A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.  There is no respondeat superior liability under section 1983.

The fact of confinement itself necessarily limits prisoners' retained constitutional rights.  *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 545-46 (1979).  The United States Supreme Court established the standard of law governing constitutional claims of inmates in *Turner v. Safley*, 482 U.S. 78 (1987).  There, the Court examined a free speech issue in the context of prison officials prohibiting correspondence between inmates residing at different state institutions, holding that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate

**MEMORANDUM DECISION AND ORDER  8**

penological interests." *Id.* at 89.  The Court identified four factors to consider when

determining whether a regulation is valid: (1) whether there is a "rational connection

between the prison regulation and the legitimate governmental interest put forward to

justify it"; (2) whether "there are alternative means of exercising the right that remain

open to prison inmates"; (3) what "impact accommodation of the asserted constitutional

right will have on guards and other inmates, and on the allocation of prison resources

generally"; and (4) whether "ready alternatives" exist.  *Id.* at 89-90.  Although this

deferential analysis applies to most constitutional claims, it does not apply to claims

arising under the Eighth Amendment.  *Johnson v. California*, 543 U.S. 499, 511 (2005);

*Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993).

Even if a plaintiff is able to show a violation of a constitutional right under § 1983,

a defendant may still be entitled to summary judgment on the basis of qualified immunity.

The doctrine of qualified immunity protects state officials from personal liability for on-

the-job conduct so long as the conduct is objectively reasonable and does not violate an

inmate's clearly-established federal rights.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982).  Contrarily, a state official may be held personally liable in a § 1983 action if he

knew or should have known that he was violating a plaintiff's clearly-established federal

rights.  *Id*.  True to its dual purposes of protecting state actors who act in good faith and

redressing clear wrongs caused by state actors, the qualified immunity standard "gives

ample room for mistaken judgments by protecting all but the plainly incompetent or those

who knowingly violate the law."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quotation

**MEMORANDUM DECISION AND ORDER  9**

omitted).  Qualified immunity is a defense both to constitutional claims and to statutory claims, such as claims under RLUIPA.  *See Lovelace v. Lee*, 472 F.3d 174, 198-99 (9th Cir. 2006).

A qualified immunity analysis consists of two prongs: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right" ; and (2) whether that right was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808 (2009) (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).  Addressing the two prongs of the test in this order is often beneficial, but it is not mandatory.  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 129 S. Ct. at 818.

To determine whether the right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act.  *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996).  In the absence of binding precedent, the district courts should look to available decisions of other circuits and district courts to ascertain whether the law is clearly established.  *Id.*

The inquiry of whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.  For the law to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand" that his conduct violates

**MEMORANDUM DECISION AND ORDER  10**

that right.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  It is not necessary that the

"very action in question has previously been held unlawful," but "in the light of pre-

existing law the unlawfulness must be apparent" to the official.  *Id*.  "The relevant,

dispositive inquiry is whether it would be clear to a reasonable [defendant] that his

conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202 (citing

*Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

Application of qualified immunity is appropriate where "the law did not put the

[defendant] on notice that his conduct would be clearly unlawful."  *Id*.  However, if there

is a genuine dispute as to the "facts and circumstances within an officer's knowledge," or

"what the officer and claimant did or failed to do," summary judgment is inappropriate.

*Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).  When a § 1983 defendant

makes a properly supported motion for summary judgment based on qualified immunity,

the plaintiff has the obligation to produce evidence of his own; the district court cannot

simply assume the truth of the challenged factual allegations in the complaint.  *Butler v.*

*San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004).

## C.  First Amendment Claims and RLUIPA

Plaintiff asserts First Amendment claims alleging that Defendants Peterson,

Taylor, and Blades violated his right to free exercise of his religion and retaliated against

him for making a complaint with respect to a religious service.  He also asserts claims

under RLUIPA.

### 1.  Material Facts

**MEMORANDUM DECISION AND ORDER  11**

For most of his life, Plaintiff has been a "hard-core Christian, of the Pentecostal denomination."  Affidavit of Dennis Mintun (Docket No. 50) ("Mintun Aff.") at ¶15. Plaintiff used to attend a nondenominational Christian fellowship at ISCI and also sang in the choir.  This fellowship was organized and run by inmates, and anyone was free to preach, teach, or testify about his beliefs.  *Id.* at ¶16.  Plaintiff states that he would repeatedly hear inmates testify that homosexuality is a sin.  This occurred at "pretty much every meeting."  *Id.*  At one of these meetings, inmate Monte Brandt gave a sermon about the Biblical story of Sodom and Gomorrah, interpreting the story as a parable for God's punishment of sin -- specifically, the sin of homosexuality.  *Id.* at ¶17.  According to Plaintiff's beliefs, homosexuality is not a sin.  Numerous Christian denominations share this view.  *Id.* at ¶15.  When Plaintiff confronted Brandt about the sermon, Brandt asked if Plaintiff was gay.  Plaintiff answered that he was.  Brandt then told Plaintiff he should "step down" from participating in the fellowship, including the choir.  *Id.* at ¶18.

Plaintiff complained to Defendant Chaplain Petersen about the situation.  He alleges Peterson told him, "Monte was in charge, and I stand by what he says."  *Id.* at ¶19. Despite this alleged statement, Petersen and another chaplain, Defendant Taylor, began an investigation into Plaintiff's concerns.  Affidavit of Darrell Taylor (Docket No. 29) ("Taylor Aff.") at ¶10.  Defendant Taylor reviewed the material that Brandt had used in his sermon.  "The commentary was from a mainline Christian publisher and taught to hate the sin of homosexuality, but love the sinner who practiced it."  *Id.*  From the information Defendant Taylor received from Plaintiff, he believed that Brandt had "carried the lesson

**MEMORANDUM DECISION AND ORDER  12**

somewhat further" from the material and told Brandt that "his treatment of the subject was inappropriate." *Id.* at ¶11.

Prior to Taylor's and Petersen's investigation, Plaintiff had been singing in the choir. After Plaintiff's complaint and during the investigation of that complaint, Taylor and Petersen decided to keep Plaintiff out of the choir until they had "all the relevant information." *Id.* After the investigation was concluded, Defendant Taylor wrote to Plaintiff and told him he was welcome to come back to the choir, as long as he "[went] by the guidelines set up for the music slots." *Id.*, Exhibit A, p. 3.

Plaintiff states that he was prohibited not only from singing in the choir during the period when the investigation was conducted, but also from speaking or testifying in the fellowship: "I was prohibited from doing anything but sitting there and listening, and with my Pentecostal background, this meant that I was effectively prevented from worshiping as I would have wished." Mintun Aff. at ¶24. He also claims that in spite of Defendant Taylor's written notice that he could return to the choir, Defendant Peterson told him "verbally, and in private, that he would not recommend [Plaintiff's] coming back." *Id.* at ¶25. Plaintiff's affidavit is unclear as to whether Defendant Petersen told him only that he should not come back to sing in *the choir*, or that Defendant Petersen told him he should not come back to the interdenominational fellowship or attend services *at all*. *Id.*

Plaintiff asked Defendants Petersen and Taylor if he could organize and conduct "a new fellowship meetings [sic] for gay Christians, so that we could worship without

**MEMORANDUM DECISION AND ORDER 13**

continually being told that our sexual orientation is a sin." *Id.* at ¶21.[3]  Although

Defendant Petersen contends that Plaintiff did not request permission to conduct an

alternate service, but instead only to teach a class, *see* Affidavit of Les Petersen (Docket

No. 28-6) ("Petersen Aff.") at ¶8, the Court accepts Plaintiff's version of events for

purposes of summary judgment.

Plaintiff states that his request was denied because the proposed alternate service

was not an "IDOC approved religion."  Mintun Aff. at ¶22.  He does not, however, state

which Defendant actually denied his request.  *Id.*  Thus, it is unclear whether Defendant

Petersen or Defendant Taylor made the initial decision on the alternate fellowship, or

whether one or both of them simply passed the request up the chain of command to

another Defendant.  *See* Petersen Aff. at ¶8.  Plaintiff did file a grievance regarding the

inability to sing, preach, teach, or testify in the fellowship during Defendants Petersen's

and Taylor's investigation, but Plaintiff mentioned his request for an alternate fellowship

only as an informal way he had tried to resolve the dispute -- not as an independent

complaint.  *See* Initial Complaint (Docket No. 3) at 14, Exhibit 1; Taylor Aff., Exhibit A,

p. 1.

---

[3] Plaintiff clearly states in his First Amended Complaint that he wanted to "organize an
alternate service that would be 'gay-friendly.'"  FAC at 5.  Plaintiff even included this claim
in his initial Complaint, *see* Docket No. 3 at 10, and the Court addressed it directly in its Initial
Review Order, *see* Docket No. 6 at 3.  There is simply no basis for Defendants' argument that
the question of a new fellowship is "a new issue not authorized by the Court."  Reply at 10.  The
Court also rejects Defendants' argument that Plaintiff's claim -- that he had a right to organize an
alternative service for gay Christians -- is necessarily an Establishment Clause claim.  *See id.*
The Court specifically authorized Plaintiff to proceed on this issue as a free exercise claim.  *See*
Docket No. 6 at 3.

**MEMORANDUM DECISION AND ORDER  14**

Plaintiff alleges that, because of Defendants' actions with respect to the interdenominational fellowship and choir, he never returned to either one.  Mintun Aff. at ¶26.  His beliefs have become "confused," and he has been attending pagan or Wiccan meetings instead of Christian services "because they are more accepting of homosexual individuals."  *Id.*

### 2.     Free Exercise and RLUIPA Claims

The Free Exercise Clause absolutely protects the right to believe in a religion; it does not absolutely protect all conduct associated with a religion.  *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940).  Inmates clearly retain their free exercise of religion rights in prison.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  Free exercise claims are subject to a *Turner* analysis.  *Jones v. N.C. Prisoners' Labor Union*, 433 U.S. 119, 125 (1977).  The courts, therefore, must balance inmates' First Amendment rights against the legitimate goals of the correctional facility.  *See Turner*, 482 U.S. at 89.

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person . . . is in furtherance of a compelling governmental interest[] and . . . is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).  The Ninth Circuit has defined a substantial burden on religion as something that is "oppressive to a significantly great extent."  *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (internal quotation

**MEMORANDUM DECISION AND ORDER  15**

marks omitted) (citing *San Jose Christian Coll. v. City of Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir. 2004)).  In determining whether to grant summary judgment on an RLUIPA claim, the Court must consider the extent of the burden on Plaintiff's religious activities, the extent of the burden on the prison in accommodating Plaintiff's desire to worship as he chooses and his request for an alternative service, and the existence of less restrictive alternatives.  *See Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir. 2008).  Unlike free exercise claims, claims under RLUIPA are not subject to the deferential *Turner* analysis, and therefore Defendants must meet a "much stricter burden" to be entitled to summary judgment.  *Greene v. Solano County Jail*, 513 F.3d 982, 986 (9th Cir. 2008).

As noted above, some of the facts surrounding Plaintiff's religious claims are unclear.  Plaintiff alleges that, during the investigation, he was prohibited from singing in the choir and from preaching, teaching, or testifying during the service.  However, it is unclear whether Defendant Petersen told Plaintiff that he should not return solely to the choir, or that Plaintiff should not attend religious services at all.  Similarly, there is not enough evidence in the record to show whether any Defendant actually denied Plaintiff's request for an alternate service, and if so, which Defendant.  Finally, it is unclear whether Plaintiff used the prison's grievance process to appeal (1) Defendant Petersen's instruction not to return to the choir and/or the fellowship or (2) the decision to deny Plaintiff's request to organize the alternate service.

The Court concludes that there is insufficient evidence at this time to determine whether Defendants are entitled to summary judgment on Plaintiff's free exercise and

**MEMORANDUM DECISION AND ORDER  16**

RLUIPA claims.  Therefore, the Court will currently deny the motion for summary

judgment without prejudice on these claims and will permit Defendants to supplement the

record and move anew for summary judgment (without refiling the previous motion and

supporting documents) within 30 days of this Order, if the facts support such a filing at

that time.

  If Defendants do so, Plaintiff shall supplement the record with admissible

evidence, such as a detailed affidavit and concern or grievance forms, setting forth how

his First Amendment free exercise rights and his rights under RLUIPA were violated by

(1) Defendants Petersen's and Taylor's decision to prohibit Plaintiff from singing,

preaching, teaching, or testifying during the investigation period, (2) Defendant

Petersen's "recommendation" after the investigation that Plaintiff not return either to just

the choir or to the fellowship at all, and (3) the refusal to allow Plaintiff to organize a

fellowship for gay Christians.  Plaintiff may also wish to address whether any or all of

these claims have been exhausted.

  **3.**  **Retaliation Claim**

  In addition to his free exercise and RLUIPA claims, Plaintiff also alleges that

Defendants Petersen's and Taylor's decision to prohibit Plaintiff from speaking,

preaching, teaching, or testifying during the time they investigated Plaintiff's complaint

regarding anti-gay comments by other inmates was made in retaliation for that complaint.

Mintun Aff. at ¶19-23.

  A First Amendment retaliation claim must allege the following: "(1) An assertion

**MEMORANDUM DECISION AND ORDER  17**

that a state actor took some adverse action against an inmate (2) because of (3) that

prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his

First Amendment rights, and (5) the action did not reasonably advance a legitimate

correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) footnote

omitted).  A "chilling effect on First Amendment rights" is enough to state an injury.

*Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001).  "Because a prisoner's First

Amendment rights are necessarily curtailed, however, a successful retaliation claim

requires a finding that 'the prison authorities' retaliatory action did not advance legitimate

goals of the correctional institution or was not tailored narrowly enough to achieve such

goals.'" *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (quoting *Rizzo v. Dawson*,

778 F.2d 527, 532 (9th Cir. 1985)).

 Plaintiff asserts that Defendants Petersen and Taylor had a retaliatory motive for

keeping Plaintiff out of the choir and the fellowship during the investigation.  Defendants

have offered evidence that IDOC policy requires that inmates be separated during an

investigation.  Affidavit of Timothy Higgins (Docket No. 55-1) ("Higgins Aff.") at ¶20.

This makes logical sense: a disagreement between inmates could easily escalate into

something more dangerous.  Therefore, Defendants have met their burden of showing that

the restrictions on Plaintiff's activities advanced the legitimate correctional goal of

avoiding potentially violent confrontations between inmates involved in an investigation,

such as Plaintiff and Brandt were in this case.

 Plaintiff, however, has not pointed to any evidence of a retaliatory motive other

**MEMORANDUM DECISION AND ORDER  18**

than the fact that he was placed on these restrictions "immediately" after he complained about Brandt's and other inmates' anti-gay sentiments.  Opposition to Defendants' Motion for Summary Judgment (Docket No. 35) ("Response") at 17.  Although the timing of an official's action can be circumstantial evidence of retaliation, there must generally be something more than simple timing to support an inference of retaliatory intent.  *See Pratt*, 65 F.3d at 808.  Additionally, although it can be said that Defendants' investigation was undertaken "because of" Plaintiff's complaint about Brandt, Plaintiff has produced nothing that could be construed as evidence of a retaliatory motive for separating him from Brandt.  A bare assertion of retaliation is not enough, *see Rizzo*, 778 at 532 n.4, and accepting Plaintiff's argument would lead to the incongruous result that a plaintiff could state a retaliation claim when the officials actually took action to investigate his complaint.  Defendants' motion will be granted on the retaliation claim.

**D.     Equal Protection Claims**

Plaintiff alleges equal protection violations against Defendants Petersen, Taylor, Bassford, Wren, Jorgenson, Knapp, and Blades, claiming that he has been discriminated against because he is gay.

"[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (internal citation and quotation marks omitted).

**MEMORANDUM DECISION AND ORDER  19**

Equal protection claims alleging disparate treatment or classifications are subject to a heightened standard of scrutiny when they involve a "suspect" or "quasi-suspect" class, such as race or national origin, or when they involve a burden on the exercise of fundamental personal rights protected by the Constitution. *See, e.g., City of Cleburne v. Cleburne Living Ctr., Inc*., 473 U.S. 432, 440 (1985). Otherwise, equal protection claims are subject to a rational basis inquiry. *See Heller v. Doe*, 509 U.S. 312, 319-20 (1993).

Plaintiff is not a member of a protected class; neither prisoners nor homosexuals constitute a suspect or quasi-suspect class. *Glauner v. Miller*, 184 F.3d 1053, 1054 (9th Cir. 1999) (per curiam); *Philips v. Perry*, 106 F.3d 1420, 1425 (9th Cir. 1997). Moreover, Plaintiff's equal protection claims involve either his prison job or his ability to socialize with other inmates. An inmate's claims involving prison employment, as well as those involving the right to freedom of association, are subject only to rational basis review. *See Hoptowit v. Ray*, 682 F.2d 1237, 1254-55 (9th Cir. 1982) (prisoners have no constitutional right to employment); *Jones*, 433 U.S. at 132 ("First Amendment associational rights . . . may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that such associations, whether through group meetings or otherwise, possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment.").

Therefore, the relevant inquiry is whether Defendants' action is "patently arbitrary and bears no rational relationship to a legitimate governmental interest." *Vermouth v.*

**MEMORANDUM DECISION AND ORDER  20**

*Corrothers*, 827 F.2d 599, 602 (9th Cir. 1987) (quotation omitted).  Under this rational

basis test, Plaintiff can prevail only if he is similarly situated with persons who are treated

differently by Defendants, and Defendants have no rational basis for the dissimilar

treatment.  Even where similarly-situated persons are treated differently by the state,

however, "state action is presumed constitutional and 'will not be set aside if any set of

facts reasonably may be conceived to justify it.'"  *More v. Farrier*, 984 F.2d 269, 271

(9th Cir. 1993) (quoting *McGowan v. Maryland*, 366 U.S. 420, 426 (1961)).  In addition

to the deference inherent in a rational basis inquiry, an additional layer of deference to

prison officials is required under *Turner*.  *Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir.

2004) ("In the prison context, . . . even fundamental rights such as the right to equal

protection are judged by a standard of reasonableness -- specifically, whether the actions

of prison officials are reasonably related to legitimate penological interests." (quotation

omitted)).  Absent evidence of invidious discrimination, the federal courts should defer to

the judgment of prison officials.  *See id.* at 277.

       **1.**     **Separation of Inmates and Inmate Comments**

            **a.**   <u>Material Facts</u>

The first of Plaintiff's equal protection claims involves the prison chapel and the

nondenominational Christian fellowship he attended.  As discussed above, Plaintiff states

that he heard "frequent comments from the pulpit against homosexuals," which

constituted "verbal 'gay-bashing' and discrimination."  FAC at 5.  Plaintiff also argues

that Defendant Petersen discriminated against him by not allowing him to sit within 3 feet

**MEMORANDUM DECISION AND ORDER  21**

of his friends when in the chapel.  *Id.*

Defendant Petersen admits separating Plaintiff and his friends in the chapel and states that he might have suggested 3 feet as an appropriate distance.  Petersen Aff. at ¶10.  Petersen claims he required space between Plaintiff and his friends to forestall potential sexual activity in the chapel.  *Id.*  At one point, when Plaintiff and his friends were sitting closely together, Defendant Petersen observed that one of the inmates appeared to have an erection.  *Id.*  He thus believed that allowing Plaintiff and his friends to sit closely together could lead to sexual activity "either in the chapel or later on the yard."  *Id.*  When Defendant Petersen told Plaintiff and his friends that he had noticed the erection, Plaintiff said he felt the comment was inappropriate.  FAC at 5.  He does not deny that one of the inmates in fact had an erection.

According to Defendant Petersen, Plaintiff presented himself as a "possible sexual predator," who would follow younger inmates when in the chapel in an apparent "effort to build a 'relationship.'"  Petersen Aff. at ¶9.  Defendant Petersen describes Plaintiff's efforts as "'grooming' behavior."  *Id.*  Plaintiff does not deny that he has engaged in this type of behavior.

        b.    Discussion

Plaintiff's claim regarding the 3-foot rule stems from his belief that he was separated from his friends only because he is gay.  In his affidavit, Defendant Petersen states that he separated these inmates because they appeared to be considering engaging in sex, not because Plaintiff is gay.  He also states he was suspicious of Plaintiff's

**MEMORANDUM DECISION AND ORDER  22**

behavior in the chapel when Plaintiff was around younger inmates.  Plaintiff does not

challenge Defendant Petersen's opinion that because overt sexual behavior is forbidden,

such grooming behavior "has the potential to effect [sic] the safe and orderly operation of

the facility."  *Id.* at ¶9.  This is sufficient to meet Defendant Petersen's initial burden of

showing that his separation of Plaintiff from his friends was not motivated by a

discriminatory intent.

Plaintiff, however, has not set forth any evidence tending to show that Defendant

Petersen's stated reason for separating the inmates -- to limit the possibility of sexual

activity -- was a pretext for discrimination.  Prohibiting sexual activity in prison is

unquestionably a legitimate penological interest.  As the Court stated in its Initial Review

Order, protecting inmates from sexually-transmitted diseases and keeping health care

costs low justify the prohibition on sexual activity between inmates.  *See* Docket No. 6 at

9-10.

Plaintiff's other claim -- that he was discriminated against because of "comments

from the pulpit" expressing hostility toward homosexuals -- fails for lack of a state actor.

Liability based on § 1983 may be imposed only on a person who violated an inmate's

rights while "acting under color of state law."  42 U.S.C. § 1983.  Plaintiff admits that the

fellowship's services were organized and run by inmates.  Mintun Aff. at ¶16.  Neither

Defendant Petersen nor Defendant Taylor conducts or participates in the services.

Petersen Aff. at ¶3; Taylor Aff. at ¶9.  The other inmates at ISCI are not state actors.  The

Court will therefore grant Defendant Petersen's motion for summary judgment of

**MEMORANDUM DECISION AND ORDER  23**

Plaintiff's equal protection claims.

### 2.      Separation of Inmates in the Library

#### a.      Material Facts

Plaintiff's second equal protection claim involves restrictions placed on him and his friends when they wished to use the prison library.  In March of 2006, Plaintiff sent a concern form to Defendant Bassford, the prison librarian.  Plaintiff complained that there were no books in the library dealing with the topic of homosexuality.  FAC at 7.  The next month, Plaintiff discovered that he was no longer allowed to go to the library at the same time as some of his friends.  He alleges he was informed that the library was not an appropriate place for socializing, and that "gays are not to hang out together."  *Id.* at 8.  Defendant Wren upheld Defendant Bassford's decision to keep Plaintiff and his friends from using the library at the same time.  *Id.*  Defendant Blades denied Plaintiff's grievance on this issue.  *Id.*

Defendant Bassford denies having told Plaintiff that gays were not allowed to hang out together.  Affidavit of Karen Bassford (Docket No. 28-9) ("Bassford Aff.") at ¶4.  She has testified that she scheduled Plaintiff and his friends at different times in the library because they "would use the library as a gathering place without utilizing the library resources."  *Id.* at ¶7.  Because space in the library is limited, inmates who only socialize in the library deprive other inmates of actually using the library's resources for their intended purpose.  *Id.* at ¶8.

Defendant Bassford also states that she later had reports from some inmates, as

**MEMORANDUM DECISION AND ORDER  24**

well as one Officer White, that Plaintiff and some of these friends were sneaking into the library bathroom for the "possible purpose of sexual activity."  *Id.*  Bassford states that this information "confirmed" her decision to separate Plaintiff and his friends when they used the library.  *Id.*  Plaintiff has not denied having used the library bathroom for sexual purposes.

> b.   Discussion

Plaintiff argues that Defendant Bassford refused to let him use the library at the same time as his friends solely because he is gay.  Plaintiff's Supplementary Brief (Docket No. 36) at 1.

Defendants have put forth not one, but two legitimate reasons why Plaintiff and his friends should not be allowed to use the library together.  First, the Court concludes that ensuring that all inmates have reasonable access to the library is a legitimate penological interest.  Indeed, inadequate access to a law library can violate an inmate's right of access to the courts.  *See Lewis v. Casey*, 518 U.S. 343, 351 (1996); *Bounds v. Smith*, 430 U.S. 817, 828 (1977).  Prison officials should not face § 1983 liability by pursuing the laudable goal of providing library resources to inmates on an equal basis.  Plaintiff and his friends were not using the library's resources, but were instead simply socializing.  Plaintiff has not denied that he and his friends would socialize in the library.  Thus, Plaintiff and his friends deprived other inmates, who actually wished to use the library resources, from doing so.  Because there were other places in the prison where inmates could socialize such as the gym, *see* Exhibit A to Bassford Aff., but not other places where inmates could

**MEMORANDUM DECISION AND ORDER  25**

have access to the library's resources, it was reasonable for Defendant Bassford to prohibit Plaintiff and his friends from being in the library at the same time in order to ensure adequate access for other inmates.

Second, based on the reports to Defendant Bassford that Plaintiff and his friends had been using the library bathroom for sex, her continued separation of these inmates was reasonable. Defendant Bassford's actions limited the opportunities for inmates who had engaged, or attempted to engage, in sexual activity in the library bathroom to do so again. Thus, not allowing these inmates to visit the library at the same time is reasonably related to pursuing the legitimate penological interest in curtailing sexual activity among inmates.

Even assuming, as the Court must on summary judgment, that Defendant Bassford told Plaintiff that gay inmates were not allowed to socialize together, this single statement – although inappropriate and completely unprofessional – is not enough to overcome Defendants' strong evidence that the separation of Plaintiff and his friends was rationally related to a legitimate penological interest. Therefore, Plaintiff's claim against Defendant Bassford must fail. The claims against Defendants Wren and Blades, which depend on Defendant Bassford's actions, also fail. The Court will grant Defendants' motion on these claims.

**MEMORANDUM DECISION AND ORDER  26**

### 3.     Prison Employment

<u>a.</u>     <u>Material Facts</u>

Plaintiff's final equal protection claim revolves around Plaintiff's prison job. Plaintiff formerly worked in the print/decal shop for Correctional Industries ("CI"), the prison's employment company. He claims that the CI Supervisor, Defendant Jorgenson, drove him to quit his job by making snide comments and allowing "much ridicule and harassment" of Plaintiff for being gay. FAC at 5. Defendant Jorgenson allegedly printed tool tabs with the name "Darla Mintun" printed on them, instead of "Dennis Mintun," even making a special presentation of them in front of the other inmate-employees. *Id.* Other inmates have testified that they saw these tool tabs. Affidavit of Robert Champion (Docket No. 39) ("Champion Aff.") at ¶2; Affidavit of Jeremy Day dated November 24, 2008 (Docket No. 42) ("First Day Aff.") at ¶4. Plaintiff also claims Jorgenson would cut out pictures of men and put them on Plaintiff's coffee cup. Plaintiff took a different job to avoid this harassment, which he later had to leave due to back problems. FAC at 5.

Plaintiff states that he tried to reapply for the print/decal shop but was not granted an interview. *Id.* He later "discovered" that he had been "black-listed" because he is gay. *Id.* at 5-6. According to Defendant Knapp, the reason Plaintiff was not rehired was because the print/decal contracts were "winding down," resulting in a reduction in work force from 50 to 31 employees. Affidavit of Terry Knapp (Docket No. 28-7) ("Knapp Aff.") at ¶¶12, 14. Knapp invited Plaintiff to resubmit an application when new job openings were posted. *Id.* at ¶16.

**MEMORANDUM DECISION AND ORDER  27**

b.    Discussion

Plaintiff's claim is based on two incidents: (1) Plaintiff's quitting his job allegedly because of discriminatory harassment by Jorgenson, and (2) Jorgenson's and Knapp's failure to hire Plaintiff when he reapplied.

With respect to the failure to rehire claim, Defendants have put forth sufficient evidence that Plaintiff was not rehired in the print/decal shop because of lack of work, rather than because he is gay.  Plaintiff has failed to submit evidence that would raise a genuine issue of fact on this issue.  His First Amended Complaint states that he "discovered" that he was "black-listed," but he does not state how or from whom he learned this information.  He does not contradict Defendant Knapp's testimony that there was a lack of work in the print/decal shop and thus fails to raise an inference of discriminatory intent.  The Court will grant summary judgment to Defendants Jorgenson and Knapp on the failure to rehire claim.

However, Defendants' motion for summary judgment does not adequately address the alleged harassment by Defendant Jordan, which led Plaintiff to quit his job in the first place.  Memorandum in Support of Motion for Summary Judgment (Docket No. 28-1) ("Memorandum in Support") at 13-14.  Defendant Knapp claims that Jorgenson thought Plaintiff was a good worker whose skills were "above standard."  Knapp Aff. at ¶9.  However, this statement cannot overcome Plaintiff's evidence that Jorgenson taunted him with pictures of men on his coffee cup, or that Jorgenson made -- and prominently displayed -- tool tabs labeled "Darla Mintun."  Notably, Defendant Jorgenson did not

**MEMORANDUM DECISION AND ORDER  28**

submit an affidavit denying these allegations.  Defendants have not claimed that any legitimate penological interest could justify such demeaning treatment, and the Court cannot conceive of one.

Defendants' entire qualified immunity argument with respect to the equal protection claim against Defendant Jorgenson consists of two conclusory sentences: "Similarly, the decision not to rehire Mintun in the CI shop was based on lack of work. There is no basis for concluding that Mr. Jorgenson could have known that he was violating Mintun's rights (which he was not)."

This brief conclusion does not sufficiently raise the defense of qualified immunity with respect to Defendant Jorgenson's treatment of Plaintiff prior to Plaintiff's leaving the print/decal shop.  Defendant Jorgenson has therefore waived this defense.  In any event, a qualified immunity argument would fail on the merits.  The Supreme Court has held that state action undertaken only because of animus toward homosexuals violates the Equal Protection Clause, even under the deferential rational basis standard.  *Romer v. Evans*, 517 U.S. 620, 634-35 (1996).  This is because state action based on a "'bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.'" *Id.* at 634 (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (omission in original)).  *Romer* represents clearly established law that animus or a desire to harm cannot justify discriminatory treatment under any constitutional standard.  Defendant Jorgenson's alleged treatment of Plaintiff tends to show that Jorgenson had precisely this unconstitutional motivation.

**MEMORANDUM DECISION AND ORDER  29**

Plaintiff has shown that a genuine issue of material fact exists as to whether Defendant Jorgenson treated him differently from other inmates by forcing him out of his job, and whether that treatment was on account of Plaintiff's sexual orientation. Therefore, summary judgment will be denied as to Plaintiff's equal protection claim against Defendant Jorgenson regarding discriminatory treatment in the print/decal shop. It will be granted as to Plaintiff's claims against Defendants Jorgenson and Knapp involving the failure to rehire him.

**E.      Procedural Due Process Claim**

      **1.      Material Facts**

In June of 2006, Plaintiff received a DOR for engaging in sexual activity with another inmate, Michael Johnston.  FAC at 8.  The other inmate pled guilty and admitted that he and Plaintiff had engaged in sexual activity.  *Id.*; Affidavit of William Loomis (Docket No. 28-5) ("Loomis Aff."), Exhibit C.  Plaintiff denies that any such activity took place and claims that Johnston was "threatened and coerced" into making that admission. FAC at 8.

Defendant Long was the hearing officer.  Defendant Long found Plaintiff guilty of the DOR, and Plaintiff received a sentence of 30 days in "the hole" (or solitary confinement), 30 days gym restriction, and 40 hours of extra duty.  *Id.*; Loomis Aff., Exhibit C.  Defendant Blades upheld Defendant Long's decision.  FAC at 8.

      **2.      Discussion**

In its Initial Review Order, the Court informed Plaintiff that in order to proceed on

**MEMORANDUM DECISION AND ORDER  30**

a due process claim with respect to the DOR, he would have to allege specific facts

showing that he had a liberty interest in being free from placement in segregation, as

required by *Sandin v. Conner*, 515 U.S. 472, 486-87 (1995).  *See* Docket No. 6 at 7-8.

Plaintiff has not done so, either in his First Amended Complaint or in his response to

Defendants' motion for summary judgment.  Further, because the hearing officer's

decision relied on Johnston's admission that he and Plaintiff had in fact engaged in sexual

activity, Plaintiff does not have a claim under *Burnsworth v. Gunderson*, 179 F.3d 771,

775 (9th Cir. 1999) (inmate does not have to show a liberty interest if he was convicted

without "a shred of evidence").  Summary judgment will therefore be granted on

Plaintiff's due process claims against Defendants Long and Blades.

## F.    Eighth Amendment Claims

Plaintiff asserts two Eighth Amendment claims based on the failure of prison

officials to protect him from attacks by other inmates.  He asserts the first claim against

Defendants Jordan, House, and Dietz, alleging he was harmed by other inmates when he

was housed in Unit 15.  His second claim involves the decision by Defendant House to

move Plaintiff to Unit 16, where he was later attacked; this second claim is asserted only

against Defendant House.[4]

---

[4] Plaintiff initially alleged Eighth Amendment claims against Defendant Blades, but the Court stated Plaintiff could proceed against Blades but ordered that he clarify his claims by amendment.  *See* Docket No. 6 at 5-6.  Plaintiff did not do so, nor did Plaintiff include in his Response to the instant motion any allegations that Blades knew about his placement in Units 15 or 16.  Thus, the Court concludes that Plaintiff has abandoned his Eighth Amendment claims against Defendant Blades.

Plaintiff also alleged initially that Defendant Billie Finley had expressed that "she did not

**MEMORANDUM DECISION AND ORDER  31**

### 1.      Material Facts

Plaintiff states that inmates at ISCI learn very early which housing units are particularly dangerous and which are comparatively safer.  From Plaintiff's experience with other inmates in the Reception Diagnostic Unit ("RDU"), where inmates are first evaluated and classified, he believes that in 2006, members of Mexican gangs were prevalent on Unit 15, and the Aryan Knights were prevalent on Unit 16.  Mintun Aff. at ¶3.

### a.      Unit 15

In May of 2006, Plaintiff was living in Unit 14, one of numerous housing units at ISCI.  *Id.*  Defendant Jordan, the housing sergeant for Unit 14, told Plaintiff he had to move to Unit 15.  *Id.*  Plaintiff was afraid to move because he had been told by other inmates that gang members on that unit were "gunning" for him.  *Id.* at ¶4.  Plaintiff told Defendants Jordan, House, and Dietz that he would be "in trouble" if he was moved to Unit 15.  *Id.*

Plaintiff did not know the specific names of the inmates who were threatening him.  Plaintiff did, however, know a couple of nicknames.  Plaintiff told Defendant Jordan the nicknames.[5]  *Id.* at ¶6.  It does not appear that Defendant Jordan took any steps to

---

want homosexuals in her building (which may have directly or indirectly led to [his] being beaten)."  FAC at 7.  However, Plaintiff does not allege that Finley participated in the decision to move Plaintiff to Unit 16 and, in fact, names only Defendant House as the decision-maker.  FAC at 6.  Therefore, summary judgment will be granted in favor of Defendant Finley on this claim.

[5] There is no evidence that Plaintiff informed Defendants House or Dietz of these nicknames.

**MEMORANDUM DECISION AND ORDER  32**

investigate the nicknames.  Defendant Jordan told Plaintiff that if he could not "name specific names," he would have to move to Unit 15.  *Id.*  Not knowing the actual names, Plaintiff refused to move, received a DOR, and was placed in solitary confinement.  *Id.*

After Plaintiff was taken out of solitary confinement, he was moved to Unit 15. Plaintiff states he was "repeatedly slapped, threatened, and had all [his] hygiene items stolen."  *Id.* at ¶7.  After 3 days of living in Unit 15, the sergeant in charge (whom Plaintiff does not identify) moved him because of concerns for his safety.  *Id.*

> b.    Unit 16

Sometime after Plaintiff was removed from Unit 15, he was charged with the DOR sexual activity.  *Id.* at ¶8.  As a result, he was again placed in solitary confinement.  After being removed from solitary confinement this second time, Plaintiff lived in Unit 7 for a few days and was then told by an unnamed officer that he would be moving to Unit 16. *Id.* at ¶9.  Plaintiff told the officer he was afraid to move to Unit 16, but was told to address his concerns with the officers on Unit 16 once he arrived there.

Plaintiff was transferred to Unit 16 in the company of Michael Johnston, the inmate with whom Plaintiff had allegedly engaged in sex, even though inmates who had been accused of such activity "would typically be separated."  *Id.* at ¶12; *see also* Higgins Aff. at ¶18 (placing such inmates in different housing units is ordinarily preferred to housing them in the same unit).  Once in Unit 16, Plaintiff and Johnston were "immediately harassed and slapped around right in the middle of the day room."  Mintun Aff. at ¶13.  They attempted to speak to some officers, who said they were too busy.

**MEMORANDUM DECISION AND ORDER  33**

Sometime after 4:00 p.m., two inmates attacked Plaintiff and Johnston. They ordered Plaintiff and Johnston to leave and stated they did not want any "faggots" on their unit. *Id.* At the time of the attack, there were around 100 inmates in the day room, but there was no officer on duty. *Id.* at ¶14.

The attackers, members of the Aryan Knights, punched Plaintiff and knocked him unconscious. *Id.* at ¶¶13-14; FAC at 6. He awoke to find Johnston lying in a pool of blood. The officers in the observation bubble noticed the melee only after Plaintiff had repeatedly waved his arms and yelled at them. Mintun Aff. at ¶14. The officers eventually broke up the attack, approximately 20 minutes after it began. FAC at 7.

The parties have submitted a substantial amount of evidence regarding the safety of Unit 16 relative to other housing units at ISCI. According to Plaintiff and his witnesses, Unit 16 had an especially violent reputation. Plaintiff states that Unit 16 was known as "gladiator school," meaning "the roughest unit" or "a place where inmates train to be fighters." Mintun Aff. at ¶11. Several other inmates agree with Plaintiff that Unit 16 was commonly referred to by the inmates as "gladiator school" or as "thunder dome," presumably a reference to the Mad Max fighting cage of the same name. Affidavit of Jeremy Day, dated July 28, 2009 (Docket No. 43) ("Second Day Aff."), at ¶1; Affidavit of Ryan Adamson, dated July 28, 2009 (Docket No. 41) ("Second Adamson Aff."), at ¶2; Affidavit of Kyle Merrill, dated July 28, 2009 (Docket No. 45) ("Second Merrill Aff."), at ¶2; Affidavit of Chancey Baker, dated July 28, 2009 (Docket No. 47) ("Second Baker Aff."), at ¶1; Affidavit of Chris Gladhart (Docket No. 48) ("Gladhart Aff.") at ¶3. In

**MEMORANDUM DECISION AND ORDER  34**

contrast to the inmates' testimony, Timothy Higgins, who conducted investigations involving gangs and gang members in the prison, states that he has never heard anyone refer to Unit 16 as "gladiator school" or "thunder dome."  Higgins Aff. at ¶5.

In addition to its generally violent reputation, Unit 16 was also known among inmates as a unit where homosexuals and sex offenders were specifically targeted for attack by certain gang members.  Second Adamson Aff. at ¶2 ("The reputation of Unit 16 in 2006 was such that you feared for your life if you were gay or a sex offender and assigned to that unit."); Second Merrill Aff. at ¶3 (sex offenders and homosexuals were "particularly vulnerable to attack" in Unit 16).  Further, Unit 16 was potentially more dangerous than other units simply because of its physical layout.  One inmate describes Unit 16 as "an open dorm" where "[a]ll inmates had access to each other," instead of being separated into tiers.  Gladhart Aff. at ¶1.

Inmate Jeremy Day has testified he was housed in Unit 16 for three or four months in 2006.  During his stay in the unit, Day "constantly heard comments being made against gays, and heard several inmates state that if anyone even acted gay in the day room or open areas, or anywhere that they could be seen, that they would threaten them with violence."  Second Day Aff. ¶1.  Day hid the fact that he was gay from the other inmates on Unit 16 because he feared that if any of them found out, he would be attacked.  *Id.* at ¶3.

To rebut Plaintiff's contentions, Defendants have performed a statistical analysis they say proves that Unit 16 was no more violent than any other unit in the prison.

**MEMORANDUM DECISION AND ORDER  35**

Higgins Aff. at ¶5.  In addition, Defendants assert that IDOC has a practice of "keep[ing] the gang members dispersed throughout all of our facilities in order to keep their concentrations smaller and more manageable," and that IDOC "monitor[s] closely where our known gang members are being housed and move them frequently in order to keep them off balance."  *Id.* at ¶¶3, 4.

Defendants also assert that Plaintiff is the leader of the "Rainbow Warriors," a group of "self-proclaimed homosexual inmates" who allegedly feel they "should have the right to do as they wished in the privacy of their cells as consenting adults."  Higgins Aff. at ¶7.  Johnston is also a member of this group.  *Id.*  Higgins states that his investigations into the Rainbow Warriors revealed that members of the group engaged in overt sexual behavior "in the gym showers, gym restrooms, gym ping pong room, chapel restroom, [library] restroom," and around the picnic tables in front of Unit 14.  *Id.* at ¶8.  Other inmates reported that the Rainbow Warriors "bragg[ed] about how they had been able to manipulate staff into moving them into Unit 14 by complaining about threats against them in the other units."  *Id.*  Higgins classified the Rainbow Warriors as a Security Threat Group and "instructed staff to disperse them throughout the facility to break up their power base."  *Id.*

### 2.    Discussion

To state an Eighth Amendment "prison conditions" claim based on failure to prevent harm, Plaintiff must first show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  This is

**MEMORANDUM DECISION AND ORDER  36**

the objective prong of the analysis.  Plaintiff must then show that Defendants were

deliberately indifferent to the substantial risk of serious harm.  Deliberate indifference

exists when an official subjectively knows of and disregards a condition posing a

substantial risk of serious harm or when the official is "aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists," and actually

draws the inference.  *Id.* at 837.

　　　To rise to the level of an Eighth Amendment violation, the deprivation alleged

must be objectively sufficiently harmful, *id.* at 384, or, in other words, sufficiently

"grave" or "serious," *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  In *Whitley v. Albers*,

475 U.S. 312 (1986), the Court explained:

> Not every governmental action affecting the interests
> or well-being of a prisoner is subject to Eighth Amendment
> scrutiny, however.  After incarceration, only the unnecessary
> and wanton infliction of pain . . . constitutes cruel and unusual
> punishment forbidden by the Eighth Amendment.  To be cruel
> and unusual punishment, conduct that does not purport to be
> punishment at all must involve more than ordinary lack of due
> care for the prisoner's interests or safety.

*Id.* at 319 (internal citations and punctuation omitted) (omission in original).

　　　a.　　Unit 15

　　　Defendants have not moved for summary judgment on Plaintiff's claim that

Defendants Jordan, House, and Dietz violated the Eighth Amendment when they placed

him in Unit 15.  They state that "the issue is Unit 16 not 15."  Reply at 5.  Defendants are

under the mistaken impression that Plaintiff has not asserted an independent

**MEMORANDUM DECISION AND ORDER  37**

constitutional claim regarding Unit 15.  The Court did in fact authorize Plaintiff to

proceed on a Unit 15 claim.  *See* Docket No. 6 at 5 (discussing Plaintiff's transfers to both

Unit 15 and Unit 16).  In Plaintiff's First Amended Complaint, he added allegations that

Defendants House and Dietz, and not just Defendant Jordan, also violated his Eighth

Amendment rights with respect to Unit 15.  FAC at 6.

However, Plaintiff alleged only that on Unit 15, he was "repeatedly slapped

around, and all [his] hygiene items were stolen."  *Id.*  Without further description of any

injury Plaintiff might have suffered as a result of being slapped, it is entirely possible

Defendants believed that Plaintiff's allegations about Unit 15 were intended merely as

support for his claim about Unit 16 -- not as an independent claim.  Because of this

confusion, and because it is unclear whether Plaintiff suffered a "serious" or "grave"

injury in Unit 15 sufficient to state an Eighth Amendment claim, *Wilson*, 501 U.S. at 298,

the Court will deny the motion for summary judgment without prejudice so that

Defendants can decide whether to include Plaintiff's claim regarding Unit 15 in a

renewed motion for summary judgment.

> b.    Unit 16

Plaintiff's claim regarding Unit 16 is more fully developed.  Defendant House

argues that housing Plaintiff in Unit 16 did not expose him to a substantial risk of serious

harm.  He argues also that, even if Plaintiff did face a substantial risk of serious harm in

Unit 16, Defendant House did not possess the requisite culpable state of mind.

As to the objective prong of the Eighth Amendment analysis, there is conflicting

**MEMORANDUM DECISION AND ORDER  38**

evidence in the record as to just how violent Unit 16 was at the time of the relevant events.  Several witnesses testify that Unit 16 had the reputation of being the most dangerous unit in the prison.  Evidence of such a reputation includes the inmates' references to Unit 16 as "gladiator school" or "thunder dome."  Second Day Aff. at ¶1; Second Adamson Aff. at ¶2; Second Merrill Aff. at ¶2; Second Baker Aff. at ¶1; Gladhart Aff. at ¶3.  Plaintiff's witnesses also testify that Unit 16 was especially dangerous to homosexuals and sex offenders because gang members on that unit took special offense to these individuals.  Second Adamson Aff. at ¶2; Second Merrill Aff. at ¶3.  Plaintiff is both.  *See* Response at 3.

Federal Rule of Evidence 803(20) excepts testimony from the rule against hearsay if that testimony concerns the "reputation as to events of general history important to the community or State or nation in which located."  It is that community opinion -- not individual personal observations or experiences -- that triggers the application of Rule 803(20).

The Court concludes that the type of "community" envisioned by this Rule includes the community of inmates at ISCI in 2006.  A "community" has been defined as "a body of individuals organized into a unit . . . with awareness [of] some unifying trait," or as "the people living in a particular place or region and . . . linked by common interests."  Webster's Third New Int'l Dictionary (Philip Babcock Cove, ed., Merriam-Webster Inc. 2002).  Inmates live together, eat together, and socialize together.  They share the common circumstance of incarceration.  As members of a community, the

**MEMORANDUM DECISION AND ORDER  39**

inmates are competent to testify as to the reputation of different housing units at the prison, and their testimony is admissible.  It is similar to a person living in Boise stating that a certain neighborhood is "better" or "safer" than another.

Defendants' evidence indicates that the units at ISCI had a similar percentage of assaults per unit.  Although this is some evidence as to the relative dangerousness of Unit 16, it is contradicted by the testimony of the inmates.  Moreover, while Defendants' evidence considers the general number of assaults in each unit compared to the unit's population, it says nothing about whether there is a specific subset of inmates who were attacked more frequently in Unit 16 or in any other unit, such as homosexuals or sex offenders.  Plaintiff has therefore raised a genuine issue of material fact as to the extent of the risk of harm Plaintiff faced in Unit 16.

Moving to the subjective prong, the Court repeats that all reasonable inferences must be taken in the light most favorable to Plaintiff.  If the reputation of Unit 16 among the inmates at ISCI was that it was violent and dangerous, particularly to a specific group of inmates that includes Plaintiff, then it is reasonable to assume that the correctional officers and other prison officials knew of this reputation as well.  The fact that so many inmates refer to the unit as "gladiator school" or "thunder dome" implies that the officers guarding the inmates would also have heard these terms and understood what they meant. Although Defendant House "is responsible for all internal moves within the facility," Affidavit of Stan House (Docket No. 28-4) ("House Aff.") at ¶4, and therefore might not have had as much contact with the inmates as the unit sergeants did, it is reasonable to

**MEMORANDUM DECISION AND ORDER  40**

assume that the sergeants who reported to Defendant House would have informed House of the inmates' use of these terms.

Further, Defendants themselves have submitted evidence suggesting that Defendant House was aware that Plaintiff was gay and thus particularly vulnerable to attack in Unit 16. Defendants knew Plaintiff was the leader of the Rainbow Warriors and that Johnston was a member. Higgins Aff. at ¶7. Despite this knowledge and Higgins's instruction that members of the Rainbow Warriors be dispersed throughout the facility, *see id.* at ¶8, Defendant House determined that Plaintiff and Johnston should not only be moved into the same unit -- Unit 16 -- but that they also should be moved *at the same time and in each other's company*.

Defendants argue that members of the Rainbow Warriors were known to manipulate staff by reporting false threats by other inmates, but they do not claim that Defendant House relied on this belief in transferring Plaintiff, which would tend to negate a culpable state of mind. In fact, Defendant House claims he does not even remember Plaintiff or the specific transfers at issue. House Aff. at ¶4. Therefore, reasonably construing all of the evidence in the Plaintiff's favor, the Court concludes that a genuine issue of material fact exists as to whether Defendant House knew of a substantial risk of serious harm to Plaintiff before transferring him to Unit 16.

However, Defendant House will still be entitled to summary judgment on this claim if he can show that he is entitled to qualified immunity.

The first prong of the qualified immunity analysis -- that Defendant House's

**MEMORANDUM DECISION AND ORDER  41**

alleged actions violated a constitutional right -- is satisfied in this case because, as explained above, there is a genuine issue of material fact as to whether Plaintiff faced a substantial risk of serious harm in Unit 16 and whether Defendant House was deliberately indifferent to this risk in transferring Plaintiff there anyway.

In order to carry his burden on the second prong of the analysis, Defendant House must show that the right he is accused of violating was not so clearly established in the law that a reasonable officer would have known conduct was "unlawful in the situation he confronted." *Saucier*, 533 U.S. at 194-95.

Defendants assert that Defendant House was "acting *under orders* to disperse a security threat group. It goes without saying that breaking up a manipulative gang [the Rainbow Warriors] is a legitimate penological objective." Reply at 9 (citation omitted). They also claim "the facts show that Unit 16 was no more dangerous than any other unit in the facility. Hence, the officers could not have believed they were exposing Mintun to an objectively established unreasonable risk of harm in Unit 16." *Id.* Finally, they fault Plaintiff for not reporting the threats he received when he first arrived on Unit 16. *Id.*

First, that the housing officials were ordered to house members of the Rainbow Warriors in different units says nothing about whether Defendant House knew that Plaintiff faced a substantial risk of serious harm. If an inmate is in a gang or other disruptive group, or, for that matter, is not particularly well-behaved in prison, that fact does not disqualify him from constitutional protection. Even if Defendant House had to move Plaintiff somewhere, there is enough evidence in the record that he might have

**MEMORANDUM DECISION AND ORDER  42**

known Unit 16 was particularly violent toward gays and sex offenders.  It is also

suspicious that, even though the Rainbow Warriors were to be separated, two of those

members were transferred together into the same unit -- after one of them, Plaintiff, had

already been moved from Unit 15 for safety reasons.  The Court does not doubt that

"there are a number of factors which go into institutional offender moves" and that "it is

reasonable to assume that Unit 16 was where the first available beds became available."

Higgins Aff. at ¶18.  However, it is also reasonable to assume that Defendant House

recognized the danger of moving these inmates together but was deliberately indifferent

to it.  On summary judgment, the tie goes to the non-moving party.

Second, the "fact" that Unit 16 was as safe as any other unit is very much in

dispute.  The Court will not grant summary judgment on qualified immunity grounds on

the basis of a material and genuinely disputed allegation.

Finally, the fact that Plaintiff did not warn Defendant House or any other officer

about other inmates' threats toward him and Johnston is not fatal to his claim, as the

Supreme Court has made clear.  *See Farmer*, 511 U.S. at 848 ("[T]he failure to give

advance notice is not dispositive.  Petitioner may establish respondents' awareness [of

danger] by reliance on any relevant evidence.").  In *Farmer*, prison officials transferred a

transsexual inmate to another facility and placed her in general population; she was later

beaten and raped in her cell.  The inmate "voiced no objection to any prison official about

the transfer."  *Id.* at 830.  The Supreme Court held that the inmate had raised a genuine

issue of material fact as to the officials' knowledge of the risk, despite not having

**MEMORANDUM DECISION AND ORDER  43**

expressed any concern prior to the attack.  *Id.* at 848.  The inmate was a non-violent

transsexual who was young and effeminate and thus "likely to experience a great deal of

sexual pressure" in the prison.  *Id.*  Additionally, the inmate had had to be segregated

because of concerns for her safety on at least one previous occasion.  *Id.* at 830.  The

Court stated that "it does not matter whether the risk comes from a single source or

multiple sources, any more than it matters whether a prisoner faces an excessive risk of

attack for reasons personal to him or because all prisoners in his situation face such a

risk."  *Id.* at 843.  The inmate's inherent traits and the prior safety concerns were

sufficient.

 Like the inmate in *Farmer*, Plaintiff here possessed certain traits that could have

made him especially vulnerable to attack.  He is a homosexual and a sex offender.  He

had also previously been transferred out of Unit 15 because of threats to his safety.

Mintun Aff. at ¶8.  Coupled with Plaintiff's evidence that Unit 16 was particularly

dangerous to gays and sex offenders, these facts would have made it clear to a reasonable

official that transferring a known homosexual sex offender to a unit with a known

reputation for violence would violate the inmate's Eighth Amendment right against cruel

and unusual punishment.  "[I]n light of [*Farmer*], the unlawfulness [would have been]

apparent."  *Creighton*, 483 U.S. at 640.  Therefore, Defendant House is not entitled to

qualified immunity on Plaintiff's Eighth Amendment claim.

 In their Reply, Defendants make several additional arguments with respect to

Plaintiff's beating in Unit 16.  First, they contend that Plaintiff's own behavior triggered

**MEMORANDUM DECISION AND ORDER  44**

the attack and constituted a superseding event that broke the chain of causation.  Reply at

7-8.  Higgins testifies that his investigation of the incident revealed that once on Unit 16,

Plaintiff and Johnston "began open displays of affection . . . includ[ing] masturbating

each other in front of the other inmates"; he then opines that no housing unit anywhere in

ISCI would have tolerated such behavior.  Higgins Aff. at ¶13.  However, the argument

that Plaintiff's actions -- not Defendant House's -- proximately caused the attack appears

only in the Reply.  It is nowhere in Defendants' opening brief, and the Court thus

exercises its discretion not to consider it.  *See Eberle v. City of Anaheim*, 901 F.2d 814,

818 (9th Cir. 1990).

 Defendants also assert the doctrines of estoppel and unclean hands, complaining

that Plaintiff's behavior "was manipulati[ve] and inequitable."  Reply at 8.  Like the

causation issue, Defendants did not move for summary judgment on these grounds.  The

moving party "always bears the initial responsibility of informing the district court of the

basis for its motion."  *Celotex.*, 477 U.S. at 323.  Because Defendants did not do so with

respect to estoppel and unclean hands, Plaintiff does not need to present evidence on

either issue to defeat the motion on those grounds.  Accordingly, the Court will not

consider Defendants' eleventh-hour arguments.

## G. Defendants Without Allegations Against Them

 Plaintiff has not made any specific allegations against the following Defendants:

K. Yordy, Pam Sonnen, M. Johnson, R. LaTulippe, Kathleen McNulty, Sergeant M.

White, Sergeant D. Williams, C/O Bertwell, and C/O D. Johnson.  Therefore, the Court

**MEMORANDUM DECISION AND ORDER  45**

will grant summary judgment to these Defendants on all claims.

## DEFENDANTS' MOTION TO STRIKE

Defendants have filed a motion to strike all or a portion of certain affidavits submitted by Plaintiff in response to the motion for summary judgment.

**A.      Affidavits of Inmates Other Than Plaintiff**

**1.      Affidavits of Jeremy Day (Docket Nos. 42 and 43)**

Defendants object to Mr. Day's first affidavit in its entirety.  Day's statement that he saw a "Darla Mintun" tool tab is supported by adequate foundation -- the testimony of a person with knowledge.  Mr. Day need not specify the exact circumstances under which he saw the tab; that he saw it is enough for purposes of summary judgment.  However, Day's statements that he "know[s]" Plaintiff was discriminated against and harassed are not based on an adequate foundation.  Thus, the Court has not relied on these statements in its decision on summary judgment.

Day's second affidavit is based on his personal experience as a gay man living in Unit 16.  His statement that "there were much safer units for gays to live in" is an opinion regarding the different units in which Day has been housed.  There is adequate foundation for this statement.  The affidavit is also based on his perception and understanding of the general, violent reputation of Unit 16 among the inmates at ISCI, especially toward sex offenders.  As explained above, such testimony is admissible under Federal Rule of Evidence 803(20).

**2.      Affidavits of Ryan Adamson (Docket Nos. 40 and 41)**

**MEMORANDUM DECISION AND ORDER  46**

Mr. Adamson's first affidavit contains admissible testimony of the events in the chapel when Defendant Petersen instituted the 3-foot rule. His statements about what he heard Defendant Petersen say at that time are admissible statements of a party-opponent. Fed. R. Evid. 801(d)(2). The remainder of the affidavit, where Adamson claims to know that Plaintiff was banned from the library and that Plaintiff told Defendant Jordan he was afraid to move, is not supported by an adequate foundation, and the Court has not considered it.

Adamson's statements in his second affidavit as to Unit 16's reputation for violence and its being called "thunder dome" are admissible under Rule 803(20).

### 3.      Affidavits of Kyle Merrill (Docket Nos. 44 and 45)

Similarly to Mr. Adamson's first affidavit, Mr. Merrill's first affidavit also recounts events surrounding Defendant Petersen's institution of the 3-foot rule and is admissible as the testimony of a percipient witness. The Court has not considered his statements as to library events and general instances of discrimination, as he lacks personal knowledge of these events.

Merrill's second affidavit is admissible. He speaks of his experience in Unit 16, as well as the reputation of the unit among inmates. *See* Fed. R. Evid. 803(20). When he states it was his "understanding" that officers were aware of Unit 16's reputation for violence, he is making a reasonable inference that because the inmates knew of the unit's reputation, the correctional officers did as well.

### 4.      Affidavit of Chris Gladhart (Docket No. 48)

**MEMORANDUM DECISION AND ORDER  47**

Mr. Gladhart's testimony as to Unit 16 is perfectly proper.  Again, the general reputation of Unit 16 among inmates is admissible under Rule 803(20), and Gladhart's description of the unit as "an open dorm" rather than being separated into tiers is based on his personal experience living in the unit in 2002.

### 5.    Affidavit of Robert Champion (Docket No. 39)

The majority of Mr. Champion's affidavit is inadmissible as lacking personal knowledge.  However, his testimony about having seen the "Darla Mintun" tool tab is admissible.

### 6.    Affidavits of Chancey Baker (Docket Nos. 46 and 47)

Mr. Baker's first affidavit is not admissible.  He gives no basis for his belief that he was banned from the library because he is gay, or for his belief that there is "job discrimination in various shops" at CI.  His testimony that various Defendants "speak out against gays" and have harassed him is too vague to be of evidentiary value.

The Court rejects Defendants' argument that Baker's second affidavit lacks "any foundation."  Defendants' Motion to Strike (Docket No. 54-1) at 7.  In order to testify about what happens when inmates report incidents to prison guards, Baker hardly needs to show that he is "everywhere in the prison at once," nor is he required to state "exactly [what] was said" or describe exactly where he was when he heard something.  Defendants offer no logical reason why a witness must know about *everything* in order to testify about *anything*.

**MEMORANDUM DECISION AND ORDER  48**

### 7.      Necessity of Striking These Affidavits

Because the Court has not relied on any of the above statements that it has found to

be inadmissible, the Court has determined that it unnecessary to strike them.

## B.      Plaintiff's Affidavit

Defendants also request that the Court strike certain portions of Plaintiff's

affidavit, for various reasons.  The Court will address each in turn.

### 1.      Last three sentences of paragraph 3

Defendants object to the following statement:

> I did not want to move to Unit 15, because, along with Unit
> 16, Unit 15 was understood to be the most violent in the
> prison.  In 2006, it was my understanding that the Aryan
> Knights were prevalent on Unit 16 and Mexican gangs [were]
> prevalent on Unit 15.  Inmates at ISCI leard [sic] very
> quickly, from the time they are in the RDU, what the safer
> units are and which are the violent ones.

Mintun Aff. at ¶3.

Contrary to Defendants' arguments, Plaintiff did lay an adequate foundation for

this testimony.  He got his "understanding" from, among other things, the RDU.  Inmates

do talk to one another, and it is entirely possible that more experienced inmates might tell

new inmates to try to avoid certain units with bad reputations.  Because Plaintiff is

testifying about the general reputation of Units 15 and 16 among the inmates, the Court

will not strike this statement.  *See* Fed. R. Evid. 803(20).

**MEMORANDUM DECISION AND ORDER  49**

### 2.     Paragraph 6

Plaintiff states, "I have also heard Sergeant Jordan say to me on more than one occasion that he did not want 'my kind' on his unit."  Mintun Aff. at ¶6.  Defendants claim there is no foundation for this statement because Plaintiff "does not state he was ever housed in Units 15 or 16 before this incident."  Defendants also claim more information is needed, such as when Defendant Jordan said these things, where he was at the time, and exactly what he said.  Def. Motion to Strike at 2-3.

Even if Plaintiff had never been housed in Unit 15, such a fact would not show that Defendant Jordan never made the alleged statements.  Defendant Jordan was the housing sergeant in Unit 14 -- where Plaintiff was living before being moved.  Affidavit of Richard Jordan (Docket No. 28-8) ("Jordan Aff.") at ¶2.  Plaintiff was certainly in a position to hear Defendant Jordan make the alleged statements.  Further, Defendants' claim that they do not know exactly what Defendant Jordan said is disingenuous.  Plaintiff is not required to remember and relay with particularity and without mistake each word that came out of Jordan's mouth.  The Court has not found any authority suggesting that a witness is not competent to testify if he uses paraphrase.  Even so, Plaintiff directly quoted Defendant Jordan as saying that he did not want Plaintiff's "kind" on Unit 14.  The Court will not strike this statement.

**MEMORANDUM DECISION AND ORDER  50**

### 3.     Paragraph 10

The Court will not strike Plaintiff's statement that "there are certain units on which gangs are more prevalent, and Unit 16 at that time was one of them, probably the worst in the prison." Mintun Aff. at ¶10. The statement is admissible under Rule 803(20).

### 4.     Paragraph 11

Paragraph 11 provides:

> Unit 16, in particular, had in 2006 the reputation among inmates and officers of being the most violent unit in the prison. It was referred to as "gladiator school," which is a prison term for the roughest unit, or a place where inmates train to be fighters. On numerous occasions, I have heard correctional officers refer to Unit 16 jokingly as "gladiator school." I specifically have heard Sergeant Jordan call it by that name, and in a joking manner. With the exception of gang members, inmates almost uniformly wanted to stay out of that unit.

*Id.* at ¶11.

Once again, Defendant Jordan's statements are admissions of a party-opponent, and the remainder of the testimony are statements of the reputation of Unit 16. Paragraph 6 is admissible.

### 5.     Paragraph 12

Defendants take issue with Plaintiff's statement that "[i]nmates who were believed to be engaging in sex with one another would typically be separated." *Id.* at ¶12. Their objection is not well-founded. Defendants' own witness agrees that separation of such inmates is generally "preferred" and testifies that members of the Rainbow Warriors in

**MEMORANDUM DECISION AND ORDER  51**

particular were supposed to be "disperse[d] . . . throughout the facility."  Higgins Aff. at ¶18.  The Court will not strike the statement.

**6.      Paragraph 23**

With respect to Defendants Petersen's and Taylor's investigation into Plaintiff's concern regarding anti-gay comments in the chapel, Plaintiff states,

> I do not know why an investigation into a concern that I had made should have prevented me from attending services, fellowship, or choir.  It appeared to me that I was unfairly being singled out and kept out of services either for being gay, or for making the complaint.

Mintun Aff. at ¶23.

Defendants argue that "biases present when inmates opine about prison security should immediately disqualify their statements.  [Plaintiff's] assertion is nothing but a self-serving, argumentative conclusion."  Def. Motion of Strike at 4.  The Court rejects Defendants' position for two reasons.

First, that an affidavit, or a statement in an affidavit, is "self-serving" is not a proper objection.  All parties' affidavits are, of course, "self-serving": they are submitted in support of a party's position on a given issue.  Defendants' affidavits also contain such "self-serving" statements.  *See*, *e.g.*, Jordan Aff. at ¶5 ("[Plaintiff] was only able to articulate a general belief that he might be in danger . . . .");  Bassford Aff. at ¶10 ("I did not deprive Mr. Mintun of attending the library because of his sexual orientation . . . .");  Taylor Aff. at ¶12 ("I did not forbid Mr. Mintun from preaching, teaching or testifying at the open fellowship.").  If the Court were to grant Defendants' request to strike Plaintiff's

**MEMORANDUM DECISION AND ORDER  52**

statements on this basis, it would have to strike all of Defendants' "self-serving"

testimony as well.

Second, the Court will not, on summary judgment, determine the credibility of a

witness.  Defendants' attacks on Plaintiff's credibility and his supposed "bias" simply

have no place in a summary judgment motion.  Plaintiff's testimony is admissible.

### 7.      Paragraph 25

In Paragraph 25 of Plaintiff's affidavit, he states that "Chaplain Petersen told me

verbally, and in private, that he would not recommend my coming back."  Mintun Aff. at

¶25.  Defendant claims this statement should be stricken for lack of foundation:

> When did [Chaplain Petersen's statement] supposedly occur?
> Where?  And perhaps most importantly, what exactly was
> said and what was the context?  What exactly was the
> context?

Def. Motion to Strike at 4.  Defendants appear to claim (again) that without a description

of each and every detail surrounding Defendant Petersen's statement, Plaintiff's

testimony is inadmissible.

Defendants ask the Court to set the bar impossibly high.  Plaintiff testifies that

Defendant Petersen approached him and recommended that he not return to the choir

and/or the fellowship.  The Court sees no deficiency in this statement, other than that it

can be read two ways.  *See supra* Part C.2.  Human beings do occasionally forget things,

particularly things like exact dates, and particularly dates from several years ago.

Defendants are, of course, free to cross-examine Plaintiff at trial regarding this statement.

**MEMORANDUM DECISION AND ORDER  53**

Perhaps the trier of fact will believe Plaintiff's testimony about what Defendant Petersen said, perhaps not.  But if affidavits could be stricken simply because a witness's statement does not include an exact date, an exact location, or a direct quote, nearly nothing would survive summary judgment.  The Court will deny Defendants' motion to strike.

## PLAINTIFF'S MOTION TO STRIKE

Plaintiff has filed a motion to strike portions of Defendants' Reply, as well as Defendants' motion to strike.

Plaintiff's only argument in support of striking Defendants' motion to strike is that the motion was not timely filed.  However, the Court has already deemed the motion timely by granting Defendants' motion for an extension.

Plaintiff argues that the estoppel and unclean hands portions of the Reply should be stricken.  Because the Court has not considered these issues, Plaintiff's motion to strike on this basis will be denied.

The Court will also deny Plaintiff's motion to strike Higgins's affidavit.  The affidavit addresses (1) the relative dangerousness of prison housing units, including Unit 16, (2) the events surrounding Plaintiff's experiences on Units 15 and 16, (3) ISCI's procedures in responding to threats to inmates, and (4) basic investigative procedures at ISCI.  *See generally* Docket No. 55-1.  Generally, a court should not consider new evidence offered in reply without giving the non-moving party an opportunity to respond to the new evidence.  *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).  However, Plaintiff dealt with each of these issues in his opposition papers and supporting affidavits.

**MEMORANDUM DECISION AND ORDER  54**

*See, e.g.,* Mintun Aff. at ¶¶7, 10-11, 23; Second Baker Aff. at ¶2.  Therefore, Defendants were entitled to submit evidence to rebut Plaintiff's argument and evidence.  *See E.E.O.C. v. Creative Networks, LLC*, 2008 WL 5225807, *2 (D. Ariz. Dec. 15, 2008) (holding that a moving party's evidence submitted in reply is properly considered when the evidence "rebut[s] arguments first raised by [the non-moving party] in its opposition").

## CONCLUSION

The Court will grant Defendants' motion for summary judgment on all of Plaintiff's claims except (1) his Equal Protection claim against Defendant Jorgenson, (2) his Eighth Amendment claim against Defendant House involving Unit 16, (3) his Eighth Amendment claims against Defendants Jordan, House, and Dietz involving Unit 15, and (4) his First Amendment Free Exercise and RLUIPA claims against Defendants Petersen, Taylor, and Blades.  Defendants may renew their motion and file a supplement as explained in this Order with respect to claims in categories (3) and (4).  Defendants may not reargue claims (1) or (2) in their supplement.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

**A.**   Defendants' Motions for an Extension of Time to File a Reply Brief (Docket Nos. 51 and 52) are **GRANTED**.

**B.**   Defendants' Motion to File an Overlength Reply Brief (Docket No. 53) is **GRANTED**.

**C.**   Defendants' Motion for Summary Judgment (Docket No. 28) is

**MEMORANDUM DECISION AND ORDER  55**

**GRANTED IN PART and DENIED IN PART**.  It is **granted** as to the following claims and Defendants:

1.      All claims against Defendants Bassford, Wren, Knapp, Long, Finley, Yordy, Sonnen, M. Johnson, R. LaTulippe, McNulty, White, Williams, Bertwell, and D. Johnson.

2.      Retaliation claims against Defendants Petersen and Taylor.

3.      Equal Protection, Due Process, and Eighth Amendment claims against Defendant Blades.

The motion is **denied with prejudice** as to the following claims:

1.      Equal Protection claim against Defendant Jorgenson.

2.      Eighth Amendment claim against Defendant House with respect to Plaintiff's placement on Unit 16.

The motion is **denied without prejudice** as to the following claims:

1.      Free Exercise and RLUIPA claims against Defendants Petersen, Taylor, and Blades.

2.      Eighth Amendment claims against Defendants Jordan, House, and Dietz with respect to Plaintiff's placement on Unit 15.

Defendants may renew their Motion for Summary Judgment with respect to these last claims within the next (30) days by filing a supplement as set forth in this Order.  If they do so, Plaintiff shall -- within thirty (30) days of receiving Defendants' supplement -- file his own supplement responding to

**MEMORANDUM DECISION AND ORDER  56**

Defendants' allegations and argument.

**D.**     Defendants' Motion to Strike (Docket No. 54) is **DENIED**.

**E.**     Plaintiff's Motion to Strike (Docket No. 56) is **DENIED**.

DATED:  **March 30, 2010**

Honorable B. Lynn Winmill
Chief U. S. District Judge